# United States Court of Appeals
## For the First Circuit

No. 04-2343

KATHLEEN M. INGRAM,

Plaintiff, Appellant,

v.

BRINK'S, INCORPORATED,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, Senior U.S. District Judge]

Before

Boudin, Chief Judge,

Campbell, Senior Circuit Judge,

and Gertner,[*] U.S. District Judge.

Jonathan J. Margolis with whom Robert S. Mantell, Laurie A. Frankl, and Rodgers Powers & Schwartz, LLP were on brief for appellant.
James E. Kellett, Frank M. Esposito, and King, Pagano & Harrison were on brief for appellee.

July 15, 2005

---

[*]Of the District of Massachusetts, sitting by designation.

**GERTNER**, <u>U.S. District Judge</u>. This is an employment discrimination action in which appellant Kathleen Ingram ("Ingram") brought state and federal claims against her former employer, appellee Brink's, Incorporated ("Brink's"), pursuant to M.G.L. ch. 151B §§ 4(1) and (16A), and the Equal Pay Act, 29 U.S.C. § 206(d). The district court granted summary judgment for Brink's on both the failure-to-promote and unequal pay claims. Ingram now appeals. Finding no error, we affirm the district court's entry of summary judgment.

## I. <u>Background</u>

Brink's is a nationwide corporation whose core business is providing secure, armored transportation of valuables. Brink's operates from local, largely autonomous branches that vary widely in size from five to hundreds of employees. Branches are administered by a branch manager with the assistance of an assistant branch manager.

Ingram worked at Brinks for nearly three years. She was hired in September 1998 and resigned in May 2001. Although her work was exemplary, she claims that she was passed over for a number of promotions between 1998 and early 2001. The fatal problem for Ingram's discrimination claims, however, is her failure to file suit until August 2001, by which time her earlier grievances were time barred. The only relevant hiring decision during the applicable limitations period was the decision to fill the Lawrence

assistant branch manager position, but that decision was favorable to Ingram as she was offered the job. But she rejected it for a better paying one outside the company. Although Ingram goes to great lengths to describe a pattern of sex-based discrimination during her first two years with the company, without a showing of an adverse employment action within the limitations period, Ingram cannot make out even the minimal prima facie case of discrimination.

With respect to the Equal Pay Act claim, Ingram alleges that there were two male employees in the Lawrence branch and several male employees throughout the company who were paid more than she was paid for performing comparable work. But the only two employees that Ingram names – David Hardy and Jeffrey Hosfeld – were assistant branch managers. Ingram never formally held that position; she turned it down when it was offered to her. Nor did she effectively perform the same duties while she was in other positions. Without more, her pay discrimination claim cannot prevail.

### A. Ingram's Employment from September 1998 through December 2000

Ingram took her first position at Brink's in September 1998 as Chief Office Employee of its Lawrence, Massachusetts branch at an hourly wage of $11.50. The job was largely administrative and clerical. By November 1998, according to the branch manager, Ingram had become "a great asset" to the Lawrence branch, and was

reclassified from an hourly employee to a salaried employee earning $28,000 per year. Her new job title was "branch supervisor," a rare, non-managerial position with flexible duties depending on the needs of the individual branch.[1]

At the time that Ingram was hired, the Lawrence branch had no assistant branch manager. In December 1998, two months after she began working at Brink's, the assistant manager position was posted. Ingram applied, although she conceded in her application that a co-worker deserved the promotion because of his longer tenure with the company. Neither was hired; the assistant branch manager position was not filled, and the company stopped recruiting applicants until 2000 when the vacancy was posted again.

In March 1999 Ingram became pregnant. She claims no adverse employment consequence attributable to her pregnancy except for a dispute about the painting of the Lawrence branch.[2] While on maternity leave, in January 2000, the assistant branch manager position in Lawrence was posted once again. For the first time, the posting stated that the assistant branch manager will be

_____

[1] At least two members of Brink's management testified that they had never heard of the branch supervisor position before this lawsuit commenced.

[2] Ingram presented the branch manager with a note from her doctor indicating that no painting should take place in her immediate work areas, and suggesting that an air purifier be installed. In response, the branch manager ordered that the painting take place at night, but he did not install the purifier.

-4-

required "to learn every run and make recommendations for route restructuring." And it included a new requirement for on-call availability seven days per week, which Ingram, as a new mother, found to be virtually impossible. She nevertheless expressed an interest in the position to David Weinstock, the Lawrence branch manager at the time. He responded that she needed "more armored experience."

While it is true that Ingram had never worked in the armored vehicle industry before her employment with Brink's, and had no experience working on the armored trucks even within Brink's, Weinstock had never before mentioned the need for her to gain "armored experience." Indeed, notwithstanding this supposed deficiency, Weinstock rated her as "outstanding" in seventeen out of twenty categories on her February 2000 performance review. And in the section assessing areas in which Ingram needed to improve, Weinstock made no mention of the need for armored experience. In any event, when Ingram returned from maternity leave in March 2000 she set out to obtain armored experience by accompanying drivers and messengers on runs.

On April 15, 2000, Brink's appointed Jeffrey Hosfeld to the assistant branch manager position that had then been vacant for over two years. Hosfeld was a former corrections officer and had previously served as a Brink's branch supervisor in another branch, the same title that Ingram had, where he earned $4,000 more per

year than Ingram despite what Ingram describes as comparable experience and job responsibilities.[3]  In support of her challenge to Hosfeld being promoted instead of her, Ingram also claims – contradicting herself – that Hosfeld had no experience in the administrative side of business operations prior to his appointment as assistant branch manager.  In any case, Hosfeld apparently had extensive experience in the field working on armored trucks, as required by the assistant branch manager job posting.[4]

In May 2000, Weinstock was promoted to regional management, leaving the Lawrence branch without a branch manager.  Brink's posted the branch manager position, specifying that it required a bachelor's degree or its equivalent.  Ingram expressed an interest in the position. Weinstock recommended her to his supervisor, Thomas Szczepanski.  Szczepanski disagreed and chose a male, Mark Albright, on the ground that Albright was more qualified because he had a bachelor's degree and Ingram did not. However, Szczepanski offered Ingram a branch manager position at a smaller branch in Rochester, New York, although he acknowledged that she probably was not interested in moving in light of her recent maternity.  Ingram

---

[3] Although Hosfeld earned $4000 more per year than Ingram as branch supervisor of another branch, Ingram does not make an Equal Pay Act claim with respect to this issue.

[4] In any event, as described below, her challenges to his selection in this position would be time barred.

did not pursue the Rochester position. In June 2000, Albright was appointed to the branch manager position, replacing Weinstock.

In September 2000, Ingram was promoted to the position of "Operations Manager." Her salary was raised to $37,000 per year from $28,000 per year.[5]

Shortly thereafter Albright left the Lawrence branch manager position and the vacancy was posted yet again. Ingram again expressed an interest.[6] In early-October 2000, Szczepanski appointed Tim Messner, the Syracuse branch manager, as interim manager of the Lawrence branch while a more thorough search for a permanent branch manager could be conducted. As interim branch manager, Messner split his time between the Syracuse and Lawrence branches.

### B.   The Position At Issue – Assistant Branch Manger

In mid-October 2000, Hosfeld, then the Lawrence assistant branch manager, transferred to another branch, leaving vacant both the assistant branch manager and branch manager positions. Ingram applied for the former. In her letter of application, Ingram acknowledged that she did not feel ready for the branch manager

---

[5] She describes her responsibilities as Operations Manager as "overseeing all of the administrative operations of the branch, including... billing and accounting, human resources and customer troubleshooting."

[6] After the position was filled, Ingram conceded that she was not genuinely interested in the position.

position, but was "unequivocally prepared to successfully function in the capacity of Assistant Manager."

After Ingram applied, Jim Gaherity, Szczepanski's replacement as regional manager, informed Ingram that he was keeping the assistant branch manager position open until the branch manager position was filled. He wanted the new branch manager to be involved in the selection of his staff.

Ingram then expressed an interest in the branch manager's position despite her admission only weeks earlier that she was not qualified for it. Gaherity, the regional manager, rejected Ingram, appointing Daniel Harrington in her stead. Harrington had worked at Brink's since February 1999, six months after Ingram was hired. Although at the time of his appointment to branch manager, Harrington was working as a messenger in the Lawrence branch, Harrington had spent over fifteen years in management positions in the trucking and delivery field before joining Brink's. In contrast, before her employment with Brink's, Ingram had no experience in the trucking and delivery field.[7]

According to Ingram, after interviewing her for the branch manager position, Gaherity told her that she was well-suited for an assistant branch manager position. Indeed, even the new branch

_____

[7] To be clear, Ingram is not suing over her failure to be promoted to the position of branch manager. However, she compares herself to Harrington for the purpose of showing that she was passed over for promotion several times, and that each time a man assumed the management role that she sought.

manager, Harrington, agreed and expressly recommended Ingram for the position. But Gaherity hesitated, reporting to Harrington that Ingram lacked the requisite experience and qualifications. Gaherity proposed that someone from outside the company be hired instead – David Hardy, the eventual hire for the position. Harrington rejected Hardy because he had no experience in the armored car industry, and because Hardy had explicitly stated his concerns about the job's safety hazards during his interview with Harrington. As of December 2000, the assistant branch manager position remained vacant.

Ingram delivered her second child on February 22, 2001, and took maternity leave through April 2001, although she continued to come to work once a week. In March 2001, Harrington assured Ingram that he would relate to Gaherity that she was still his pick for assistant manager.

Shortly thereafter, Ingram saw the assistant branch manager position advertised in a local newspaper. When she confronted Harrington, he told her that Gaherity was resisting her promotion. Then, in mid-April 2001, Harrington showed Ingram an email message stating that Brink's was eliminating the assistant branch manager title in favor of the operations manager title, the very title that she already held. According to Brink's, the title was changed to more accurately reflect the duties of the position. The internal posting for the position was changed to reflect the title change,

but was otherwise identical to the prior posting. It is unclear from the record what the relationship was between the title change and Ingram's existing job title and duties. What is clear is that, by this juncture, Ingram was convinced that the company had no intention of promoting her.

On May 1, 2001, Harrington resigned without warning. Gaherity visited the Lawrence branch the following day, and he and Ingram had an emotional confrontation. Ingram expressed her anger at being passed over for promotion several times. Gaherity told Ingram that she could have the promotion to assistant branch manager, and that he would make a phone call to accomplish her promotion "in an hour."

Later that day, Gaherity did send an email to his supervisor, Jim Tingley, requesting that Ingram be appointed to the assistant branch manager/operations manager position, with an accompanying salary increase to $45,000, an $8,000 increase over Ingram's salary at the time and $3,000 more than Hosfeld made as assistant branch manager. The next morning, Tingley forwarded the email, along with a strong endorsement of his own, to Senior Vice President Greg Hanno. On May 18, 2001, Hanno approved the request. Weinstock, who was assisting with the management of the Lawrence branch in the face of Harrington's sudden resignation, called Ingram at home to formally offer her the promotion.

By this time, however, Ingram was on medical leave on the advice of her doctor. After not hearing back from Gaherity to confirm her promotion after their confrontation on May 1, Ingram reports leaving the office "a wreck, a total wreck." She visited her doctor who told her to take medical leave for stress. She was still on medical leave on May 18, 2001, when Harrington called to offer her the promotion. Ingram told him that she would think about the offer.

In the meantime, Ingram looked for another job. On May 30, she took a job at Genesys Software Systems with a starting salary of $47,000 per year. Notably, Ingram cited her $45,000 salary at Brink's (the amount offered with the promotion) when applying to Genesys. By letter dated May 31, 2001, Ingram resigned from Brink's, admitting that their most recent offer was what she had sought but that "it took too long."

In mid-June 2001, Hardy was hired as assistant branch manager/operations manager for the Lawrence branch. His starting salary was $50,000, $5,000 more than Brink's offered Ingram just one month prior.

## C.    Procedural History Below

Ingram filed a claim with the Massachusetts Commission Against Discrimination (MCAD) on August 8, 2001. The claim alleged violations of Massachusetts General Laws, Chapter 151B §§ 4(1) and

(16A), relating to promotions she sought during her employment with Brink's dating back to December 1998.

On May 15, 2002, Ingram filed a complaint in Essex Superior Court. The Complaint alleged a pattern and practice of gender and pregnancy discrimination by Brink's, in violation of M.G.L. ch. 151B § 4(1). On July 2, 2002, Brink's removed the case to federal court. On April 24, 2003, Ingram filed an Amended Complaint, adding a federal claim under the Equal Pay Act, 29 U.S.C. § 206(d), on the ground that both Hosfeld and Hardy were paid more than her for performing substantially equal work while they were assistant branch managers of the Lawrence branch.

On September 7, 2004, the district court entered a memorandum and order granting Brinks' motion for summary judgment on both the state and federal claims. Pursuant to the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Judge Keeton concluded that Brink's could successfully rebut a prima facie showing of discrimination by showing that Ingram was eventually offered the very promotion that she claims she was denied, and that Ingram could not rebut with a showing of pretext or discriminatory animus. See Memorandum and Order, Ingram v. Brink's, Inc., Civil Action No. 02-11333-REK, (D. Mass. September 7, 2004) at 11-13 ("Memorandum and Order of September 7, 2004"). With regard to Ingram's claim under the Equal Pay Act, the district court found that Ingram could not show that she received

-12-

less pay than any male employee performing "equal work on jobs the performance of which requires equal skill, effort and responsibility," as required by Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). Memorandum and Order of September 7, 2004, at 14-15.

## II. Discussion

### A. Standard of Review

An appellate court reviews entries of summary judgment de novo, Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004), and the reviewing court is not confined to the trial court's rationale; the trial court's ultimate holding may be sustained "on any ground manifest in the record." Id. at 70; Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).

Federal Rule of Civil Procedure 56(c) permits the trial court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." On summary judgment, the facts are viewed in the light most favorable to the nonmovant (here, Ingram), and all reasonable inferences are drawn in the nonmovant's favor. Rathbun, 361 F.3d at 64. Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by

relying on improbable inferences, conclusory allegations, or rank speculation.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) ("[n]ot every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment; the disagreement must relate to some genuine issue of material fact").  And summary judgment can be entered even where ambiguous, often murky concepts such as motive and intent are involved, as in the employment discrimination context.  Id.

**B.    Ingram's Failure-To-Promote Claim Under M.G.L. ch. 151B**

Ingram alleges that Brinks' failure to promote her to either assistant branch manager or branch manager amounts to actionable sex and pregnancy discrimination under Mass. Gen. Laws ch. 151B. In relevant part, ch. 151B § 4(1) makes it unlawful for an employer to discriminate on the basis of sex in hiring, firing, compensating, or in providing other terms, conditions, or privileges of employment.  The protections of this provision have been interpreted to apply to plaintiffs asserting claims of sex discrimination stemming from their pregnancy.  Gunther v. Gap, Inc., 1 F.Supp.2d 73 (D. Mass. 1998).

Neither party disputes that the applicable limitations period is six months, since ch. 151B §5 as it existed before 2002 requires a plaintiff to file a charge with the MCAD no later than six months

after the alleged act of discrimination.[8] <u>See</u> <u>Ocean Spray</u> <u>Cranberries v. MCAD</u>, 441 Mass. 632, 641 (2004). Accordingly, only events taking place between February 8, 2001, and August 8, 2001, the day that Ingram filed her claim with the MCAD, are actionable.[9] To be sure, discriminatory acts or practices that predate or postdate the actionable period can be used as relevant background evidence. <u>Rathbun</u>, 361 F.3d at 76. But the problem with Ingram's

---

[8] In 2002, the Massachusetts Legislature amended ch. 151B § 5, extending the limitations period from six months to 300 days. However, the parties agree that the earlier version of the statute applies to the case at bar.

[9] Pursuant to its authority under ch. 151B § 3(5), the MCAD adopted an exception to the six-month limitations period for violations "of a continuing nature," 804 Code Mass. Regs. § 1.03(2), recognizing that "some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." <u>Cuddyer v. Stop & Shop Supermarket Co.</u>, 434 Mass. 521, 531 (2001). For the continuing violation exception to apply, the plaintiff must prove that (1) at least one discriminatory act occurred within the six-month limitations period, (2) the alleged timely discriminatory act has a substantial relationship to the alleged untimely discriminatory act(s), and (3) earlier violations outside the six-month limitations period did not trigger the plaintiff's awareness and duty to assert her rights. <u>Desrosiers v.</u> <u>Great Atl. & Pac. Tea Co.</u>, 885 F.Supp. 308, 312 (D. Mass. 1995).

The continuing violation exception is unavailable to Ingram. Failure-to-hire claims, like Ingram's, generally do not fit into the exception because the discriminatory act alleged is discrete and cabined, as opposed to hostile work environment claims in which the discrimination alleged is itself a culmination of ongoing workplace attributes. Indeed, in interpreting the meaning of "act of discrimination" as it appears in the applicable statute of limitations, the SJC noted that "[i]n some instances, the precise moment of the 'act of discrimination' is easy to calculate: plainly, if an employee is denied a promotion on an improper basis, the date of the 'act of discrimination' is the date of that denial." <u>Ocean Spray</u>, 441 Mass. at 641.

-15-

case is more fundamental: While the prior acts that Ingram describes can be introduced to provide a background for or evidence of animus in connection with an adverse decision, without an adverse decision within the limitations period, the discrimination inquiry simply stops.

The following events occurred during the actionable six-month period between February 8, 2001, and August 8, 2001:

In March 2001, Harrington, the newly appointed branch manager, assured Ingram that he would tell Gaherity that she was his choice for assistant manager, although he asked Ingram whether she would be able to meet the demands of the job with two small children. She assured him that she would.

Notwithstanding Harrington's assurances, while Ingram was still on maternity leave, Brink's advertised the assistant branch manager position in the local newspaper. Gaherity, it appears, was still resisting Ingram's promotion. And then, on April 11, 2001, evidence suggested that Brink's was eliminating the assistant branch manager position in favor of an "Operations Manager," Ingram's job title at that time.

On May 1, 2001, after Harrington's resignation, Ingram reiterated her desire for the assistant branch manager title and corresponding salary. While Gaherity assured her that he would get the job for her that very day, he did not.

On May 18, 2001, Brink's finally offered Ingram the promotion and salary raise to $45,000.  Ingram, however, turned it down and instead accepted a higher paying job with a different firm.  On May 31, 2001, Ingram formally resigned.

Three weeks later, Brink's hired Hardy for the assistant branch manager/operations manager position at a starting salary of $50,000, $5,000 more than Brink's offered Ingram the month prior.

### 1.   The *McDonnell* Burden-Shifting Framework

Employment discrimination claims, including failure-to-promote claims brought under ch. 151B, are reviewed according to the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Wheelock College v. MCAD, 371 Mass. 130 (1976).

Where there is no direct evidence of discriminatory intent – no smoking gun – the plaintiff must first establish a prima facie case of gender discrimination.  McDonnell, 411 U.S. at 802.  In a failure-to-promote claim, the plaintiff establishes a prima facie case by showing that (1) she is a member of a protected class, (2) she was qualified for an open position for which she applied, (3) she was rejected, and (4) someone possessing similar qualifications filled the position instead.  Rathbun, 361 F.2d at 71.  If a prima facie case is made out, an inference of intentional discrimination is raised, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its

-17-

employment decision(s).  Id.  If the employer does so, the burden of production reverts to the plaintiff, who then must prove  that the employer's neutral reasons were actually a pretext for the alleged discrimination.  Id.; see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

If, as is the case here, the plaintiff fails to make it past the first stage, i.e. to aver a prima facie case, the inference of discrimination simply never arises and the employer's motion for summary judgment is granted.

## 2.    The Merits of Ingram's Failure-to-Hire Claim

As the district court found, it is beyond dispute that (1) Ingram is a member of a protected class based on her sex and her pregnancy status during the relevant period, and (2) she applied for the assistant manager position.  One could even conclude that Ingram was qualified for the assistant branch manager position, as Brink's apparently believed.  The problem is with respect to the third prong of the test – an adverse employment action. Ingram finally got the promotion that she wanted and she turned it down.

Ingram argues that three events occurring after February 8, 2001 can be construed as a de facto rejection of her for the assistant manager position – (1) the April 2001 advertisement for the assistant manager position, notwithstanding earlier assurances that the job was her's, (2) the elimination in April 2001 of the assistant branch manager position in favor of operations manager,

the title Ingram held, and (3) Gaherity's unfulfilled promise to secure Ingram the assistant manager position "within an hour" on May 2, 2001.  But these events, while they surely may have been frustrating to Ingram, comprise nothing more than delays in the decision making process which are not actionable.

The district court correctly found that no reasonable factfinder could conclude that the first or second occasion amounted to a rejection.  The process of finding a candidate for the assistant manager position continued; no one else was hired.  After Ingram brought the newspaper advertisement to Harrington's attention, he told her that Gaherity was "resisting" his recommendation, not that Gaherity had conclusively rejected Ingram for the position.  And, in the second instance, the change in title from "assistant branch manager" to "operations manager" was nothing more than an upper-management decision to change the title of the position to more accurately reflect its role and responsibilities.  While the significance of the title change is not at all clear, it surely did not spell rejection for Ingram.

The district court characterized the third instance – Gaherity's failed promise to secure Ingram the promotion "in an hour" – as a closer call, and then passed on the question, finding no need to decide whether this instance amounted to a rejection because Ingram's claim failed at another point in the McDonnell

test, namely Brink's ability to rebut a prima facie showing of discrimination with legitimate non-discriminatory motives.

It is difficult to construe Gaherity's actions on May 2, 2001, as a rejection. Indeed, after boasting to Ingram that he could secure her the promotion within the hour, Gaherity left the Lawrence branch and promptly drafted an email to his supervisor emphatically recommending Ingram for the assistant manager/operations manager position. Gaherity's email set the hiring process in motion, and, only two weeks later, Ingram was offered the promotion.

To be sure, Gaherity's initial assurances about how quickly he could effect her promotion were nothing more than a boast. But his empty boasts hardly amounted to a rejection. On the contrary, Ingram was offered the promotion within a relatively short time thereafter.

Without establishing that she was rejected for the promotion within the actionable time frame, Ingram cannot establish a prima facie case of discrimination and her failure-to-promote claim falters. Central to the first stage of the McDonell framework, is evidence of an adverse employment decision. To be sure, the favorable decision did not come as quickly as Ingram would have liked, and she had her hopes dashed on more than one occasion. But in the final analysis, she got the job and she chose not to take it.

**C.    Ingram's Equal Pay Claim Under 29 U.S.C. § 206(d)**

Ingram alleges that several male employees within and outside the Lawrence branch were paid more than she was paid in violation of the federal Equal Pay Act ("EPA" or "the Act"), 29 U.S.C. § 206(d)(1).  The EPA prohibits an employer from discriminating on the basis of sex "by paying wages to employees in such establishment at a rate less than the rate at which [s]he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).

**1.    The *Corning Glass* Burden-Shifting Framework**

To prevail on a claim under the EPA, the plaintiff must first establish a prima facie case by showing that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility.  Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).  Such a showing is harder to make than the prima facie showing under the McDonnell framework because it requires the plaintiff to identify specific employees of the opposite sex holding positions requiring equal skill, effort and

-21-

responsibility under similar working positions who were more generously compensated. Petsch-Schmid v. Boston Edison Co., 914 F.Supp. 697 (D. Mass. 1996). The EPA is more concerned with substance than title, so Ingram is free to bring EPA claims against male employees holding different positions then she held if she can establish that they performed comparable work.

"Equal responsibility," as it is used in the Act, is defined as "concern[ing] the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17. "Establishment," as it is used in the Act, refers to "a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9. Accordingly, Ingram's EPA claim focuses on two male employees within a single establishment – the Lawrence branch.

Once the plaintiff establishes a prima facie case of an unlawful wage differential, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions. At this stage, the Act's exceptions serve as affirmative defenses on which the employer carries the burden of proof, not just production. Corning Glass, 417 U.S. at 196.

## 2.  The Merits of Ingram's EPA Claim

The district court properly noted that Ingram provided scant evidence showing that she was paid less than Hardy and Hosfeld for

jobs requiring equal responsibility. Ingram provides no specifics as to Hardy's job functions while he was assistant branch manager after her resignation from Brink's,[10] and the specifics she provides with regard to Hosfeld's job functions while he was assistant branch manager indicate that his responsibilities were distinct from hers, and significantly more demanding. Based on these facts, Ingram's pay discrimination claim is not viable.

First, Ingram makes much of Hardy's $50,000 starting salary as assistant branch manager, $5,000 more than she was offered just a few weeks earlier. But Ingram turned down Brinks' promotion offer because she found another job paying more than the $45,000 that they offered her. But Ingram was never paid less than Hardy for the same job – she never took the job – and Hardy was offered more after Ingram had already left the company (quite possibly because the company got the message that they were not offering enough).

Second, Ingram alleges that Hosfeld was paid $4000 more per year than she was paid while he was the Lawrence assistant manager. Based on the record, however, Hosfeld and Ingram performed distinct duties. Hosfeld's responsibilities included "learning more of the operation of the branch, learning more of budgeting, being available 24 hours, seven days a week, overall supervision of the facility,

---

[10] In an EPA action, it is appropriate to compare the plaintiff-employee's compensation to that of her immediate (and non-immediate) successors and predecessors. See Broadus v. O.K. Industries, Inc., 226 F.3d 937, 941-42 (8th Cir. 2000); Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 352 (4th Cir. 1994).

opening and closing, staffing, dispatching, scheduling the runs, scheduling the personnel," and on and on. Meanwhile, by her own description, Ingram's responsibilities as operations manager were largely administrative, including maintaining billing records, preparing monthly financial reports, handling customer service issues related to billing, and performing vault audits.

In summary, both of the male employees that she alleges were being paid more for performing equal responsibilities were paid as assistant managers, a position that she never held either in title or substance. By all accounts, their duties and responsibilities were distinctly more demanding, requiring more skill breadth and training, than Ingram's duties as branch supervisor or operations manager. Without more, Ingram has failed to show that Brink's compensated certain male employees at higher rates for performing jobs requiring equal skill, effort and responsibility.

### III. **Conclusion**

For the reasons stated in this opinion, the district court's entry of summary judgment for Defendant-Appellee Brink's is

**Affirmed.**