**Luisa RIVERA–LUGARO, Plaintiff**

v.

**Johnny RULLAN, et al., Defendants.**

**Civil No. 03–1139 (JP).**

United States District Court, D. Puerto Rico.

July 20, 2007.

Adalina de Jesús–Morales, Esq., Charles S. Hey–Maestre, Esq., De Jesús, Hey & Vargas Law Office, San Juan, PR, José J. Nazario-de la Rosa, Esq., Nazario & Santiago Law Office, San Juan, PR, for Plaintiff.

Eileen Landrón–Guardiola, Esq., Eduardo A. Vera–Ramírez, Esq., Luis A. Rodríguez–Muñoz, Esq., María L. Santiago–Ramos, Esq., Landrón & Vera LLP, Guaynabo, PR, Frederic Chardón–Dubos, Esq., Frederic Chardón–Dubos Law Office, Moca, PR, Raquel M. Dulzaides, Esq., Jiménez, Graffam & Lausell, San Juan, PR, for Defendants.

## *OPINION AND ORDER*

PIERAS Senior District Judge.

The Court has before it the defendants' motion for summary judgment, the plaintiff's motion for summary judgment, and corresponding oppositions. Plaintiff Luisa Rivera–Lugaro ("Rivera") filed the instant complaint against the Puerto Rico and the Caribbean Cardiovascular Center ("PRCCC"), and four members of the PRCCC's board of directors. The plaintiff alleges the defendants terminated her from employment as Executive Director of the PRCCC in retaliation for exercising her First Amendment rights in violation of 42 U.S.C. § 1983, and because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The plaintiff also alleges she was paid a lower salary than her male successor in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) and the Fair Labor Standards Act, 29 U.S.C. § 206. Finally, Rivera alleges the defendants terminated her in violation of the Puerto Rico whistle blower statutes, P.R. LAWS ANN. tit. 29, § 185(a), P.R. LAWS ANN. tit. 1, § 601. The plaintiff moves for summary judgment on her EPA claim, and the defendants move for summary judgment on all of the plaintiff's claims. The Court denies the plaintiff and the defendants summary judgment on the EPA claim on the grounds argued, but orders the plaintiff to show cause why the defendants are not entitled to summary judgment on the ground that the pay differential was due to a factor other than sex. The Court grants the defendants summary judgment on the remaining federal claims, because the plaintiff's position as Executive Director of the PRCCC was a policy-making position to which she was entitled to no First Amendment protection, and because there is no genuine issue as to whether she was fired because of her sex in violation of Title VII.

## I. STANDARD

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affida-

vits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See, Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See, Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The parties stipulated to the following facts at the Further Scheduling Conference held on January 31, 2007.

1. Defendant Dr. Johnny Rullán, M.D. is of legal age and a resident of San Juan, Puerto Rico. At all times relevant to this action, he was the Secretary of Health of the Commonwealth of Puerto Rico and the President of the PRCCC board of directors.

2. Defendant Dr. Heriberto Pagán, M.D. is of legal age and a resident of Puerto Rico. At all times relevant to this action he was the Executive Director of the Administration of Medical Services ("A.S.E.M.") of the Commonwealth of Puerto Rico and a member of the PRCCC board of directors.

3. Defendant Dr. José Carlo, M.D. is of legal age and a resident of Puerto Rico. At all times relevant to this action, Carlo was the Chancellor of the Medical Sciences Campus of the University of Puerto Rico and a member of the PRCCC board of directors.

4. Defendant Dr. Alberto Sánchez, M.D. is of legal age. At all times relevant to this action Sánchez was a member of the PRCCC board of directors.

5. Defendant PRCCC is a public corporation created by Puerto Rico Act No. 51 of June 30, 1986, P.R. LAWS ANN. tit. 24, § 343 *et. seq.* (1989). The PRCCC has the capacity to sue and be sued. Its main offices are located at the Puerto Rico Medical Center in San Juan, Puerto Rico.

6. Rivera is of legal age and a resident of San Juan, Puerto Rico. Rivera has

a master's degree in health services administration from the University of Puerto Rico. She completed her residency in health service administration at Columbia University (Harlem Medical Center) and has years of experience in hospital and health services administration. She is a member of the Puerto Rico College of Hospital Administrators. Rivera's license number is 120.

7. Rivera was employed by the PRCCC as its Executive Director from March 7, 2001 to March 1, 2002. She was appointed by the PRCCC board of directors and reported directly to the board. From March 7, 2001 to April 5, 2001, Rivera occupied the position of Executive Director of the PRCCC in an interim capacity. She was then appointed to the position and held it until her termination on March 1, 2002.

8. Effective April 6, 2001, Rivera was appointed to the position of Executive Director of the PRCCC with a yearly salary of $89,000.

9. Rivera signed a document titled "Duties and Responsibilities Form" in her capacity as PRCCC Executive Director.

10. While Rivera was PRCCC Executive Director, she appointed Carlos Meléndez to the position of PRCCC Administrator.

11. Carlos Meléndez is a licensed hospital administrator.

12. On March 1, 2002, the PRCCC board of directors terminated Rivera's employment. Rullán, acting in his capacity as President of the PRCCC board of directors, communicated this decision to Rivera.

13. Rivera was not provided with a letter or memorandum of termination.

14. The decision to terminate Rivera was taken by the PRCCC board of directors on March 1, 2002 during a meeting held by telephone conference. Rullán, Pagán, Sánchez and Carlo participated in this meeting.

15. Before her appointment as PRCCC Executive Director, Rivera had experience in the field of health services and hospital administration. Rivera was the Administrator of the Hermanos Meléndez Hospital in Bayamón, Puerto Rico; Administrator of the Teachers' Hospital in Hato Rey, Puerto Rico; Advisor to the Vista Bahía Hospice and Home for the Elderly in Guayanilla, Puerto Rico; and Executive Director of Dr. José Gándara Medical Center in Ponce, Puerto Rico.

16. From March 25, 2002 to August 2003, Enrique Vicéns, Esq. occupied the position of PRCCC Executive Director with a salary of $110,000.00 annually.

17. Vicéns obtained his license as Medical Administrator on November 2, 2001, license number 489.

18. Vicéns signed a document entitled "Duties and Responsibilities Form" in his capacity as PRCCC Executive Director.

19. The duties and responsibilities of Vicéns in his capacity as PRCCC Executive Director were similar to the plaintiff's duties and responsibilities while she held the position.

20. After Vicéns left the position of Executive Director, Carlos Meléndez was appointed Executive Director of PRCCC.

21. Meléndez signed a document entitled "Duties and Responsibilities

"Form" in his capacity as PRCCC Executive Director.

22. The duties and responsibilities of Meléndez in his capacity as Executive Director of the PRCCC were similar to the plaintiff's duties and responsibilities while she held the position.

23. On June 25, 2001 and while she was the Executive Director of PRCCC, Rivera sent a letter to Secretary of Justice Anabelle Rodríguez, Esq.

24. On June 25, 2001, Rivera sent a letter to the Puerto Rico Solicitor General.

25. On October 15, 2001, Rivera sent a letter to María del Rosario–Ortiz, Fraud Director of the Cooperativa de Seguros de Vida ("COSVI").

26. On June 19, 2001, Rivera sent a letter to the Secretary of Justice and to the San Juan FBI Office.

The following material facts are not in genuine issue or dispute. With respect to either motion for summary judgment, each fact was listed in the movant's statement of facts, was supported by record evidence, and was not contested by the non-movant. *See, Cosme–Rosado v. Serrano–Rodríguez,* 360 F.3d 42, 44–45 (1st Cir.2004) (Because the plaintiffs failed to provide a supported factual basis for their claims against the defendants, the court properly deemed admitted the defendants' supported facts). The Court exercises its authority under Rule 56(d) of the Federal Rules of Civil Procedure to designate these facts as established in the case.

1. In his capacity as Secretary of Health, Rullán was the person of *trust* to the Governor of Puerto Rico.

2. Rullán was confirmed by the Senate of the Commonwealth of Puerto Rico in February, 2001.

3. In his capacity as Chancellor, Carlo's main duties included, without limitation, overseeing six professional schools at the Medical Sciences campus, to wit: Medicine, Dentistry, Nursing, Public Health, Health Professions, Pharmacy and Public Health. He also served on a number of boards in an *ex officio* capacity, including the PRCCC.

4. At all times relevant to this action, the PRCCC board of directors has a total of seven director positions.

5. In his capacity as board President of the PRCCC, Rullán was the ultimate authority at the PRCCC.

6. From January 2001 to December 31, 2004, César Miranda, Esq. was Secretary of the Governorship, and reported directly to the Governor of Puerto Rico.

7. In his capacity as Secretary of the Governorship, Miranda, together with a Committee appointed by the Governor, recommended Rullán for the position of Secretary of Health. Prior to this, Miranda was not personally acquainted with Rullán.

8. At all times relevant to this action, all Secretaries of the Governor of Puerto Rico's cabinet, including Rullán, reported directly to Miranda.

9. As Rullán testified at his deposition, if things under his supervision came up in newspapers or in the news, he would get a call from Miranda. In the normal course of business, Rullán would not initiate the call with Miranda.

10. In his capacity as Secretary of Health, Dr. Rullán oversaw the overall operation of institutions, hospitals and centers, other than the PRCCC, that occupied a great portion of his time and energy. In

order to be able to oversee the operations of these institutions, hospitals and centers, Rullán appointed liaisons between him and the heads of these institutions.

11. Dr. Soler–Zapata acted as a liaison between Rullán and the PRCCC Executive Director.

12. Rullán selected Soler as his liaison with the PRCCC because Soler was a cardiologist, had been involved with the PRCCC since its creation, and knew the hospital well.

13. Soler and Rullán had a long standing professional relationship dating back to the date when Rullán worked as his epidemiologist.

14. Their professional relationship continued after Rivera's dismissal from her position as PRCCC Executive Director of the PRCCC.

15. Before Rullán's appointment as Secretary of Health, Rullán and Rivera had meet professionally.

16. Before Rullán's appointment, he and Rivera had also greeted each other cordially and conversed at Robinson School in which both Rullán's and Rivera's children attended.

17. During the later part of the year 2000, Rivera met with Rullán when he attended meetings of a committee where the Department of Health's program was discussed.

18. Rivera told Rullán and Soler, as well as Rullán's assistants, that she wished to return to government service, and, specifically, to the Health Department.

19. Before Rivera's appointment as interim Executive Director, Rivera met with Rullán and Soler to discuss her interest in the position.

20. During the meeting, Rivera was specifically advised of the circumstances under which the former interim Executive Director had resigned. She was also generally briefed about the PRCCC's situation, and was told there were "a lot of problems" at the PRCCC. Rivera was told, "Well the truth is that in this environment we treat each other with *trust* regarding what we're saying."

21. Rullán and Soler advised her that she would be "starting on an interim basis until the board met" and that they had an urgent need to fill the position.

22. On July 5, 2001, the plaintiff signed a Duties and Responsibilities Sheet, which listed her duties and responsibilities as Executive Director. The document clearly states that the Executive Director of the PRCCC was responsible for executing and formulating the public policy of the PRCCC in connection with the planning, organization, operation and administration of the services offered at the PRCCC.

23. The document also states that the Executive Director is responsible for recommending and executing the necessary coordination between the PRCCC and the Department of Health, the Medical Science Campus, the Administration of Medical Services of the Commonwealth of Puerto Rico and the private sectors involved in the services provided by the PRCCC.

24. Duties and Responsibilities Sheet also states the Executive Director must seek the PRCCC board of directors' approval before executing several actions, including: (a)

the establishment of mechanisms to guarantee the quality of the services offered to patients and the prompt evaluation and correction of any deficiencies in the services provided; (b) the establishment of the administrative structure needed to assure the effective, efficient, and economical operation of the PRCCC; and (c) the establishment of the mechanisms needed in order to evaluate the credentials and the suspension or renovation of privileges to physicians. The Duties and Responsibilities Sheet also states the Executive Director was directly responsible for representing the board in any matters delegated by it to the Executive Director and for advising the board of directors of any matters that could involve a deviation from the policies or rules applicable to the PRCCC.

25. At all times relevant to this action, the position of PRCCC Executive Director was a trust position under applicable Commonwealth law.

26. At all times relevant to this action the PRCCC operated as a substantially independent public corporation.

27. In the normal course of business the board of directors of the PRCCC would run on its own unless its conduct was reported in the press, in which case Miranda would inquire into what was going on.

28. Rivera testified that it was the board of directors of the PRCCC "who decides what is going to be done and what is not going to be done on the daily operations".

29. In late 2001, Rullán created a task force to investigate several matters that were occurring at the PRCCC and that were affecting the hospital's operations.

30. The task force included two attorneys and two members of the Department of Health's Internal Audit Office.

31. The two attorneys appointed to the task force were Mayra Maldonado, Esq. and Ricardo Muñoz, Esq. The two auditing employees were Samuel Barbosa and Orlando Vélez.

32. At all times relevant to this action, Maldonado was the Director of the Office of Legal Advisors at the Commonwealth of Puerto Rico's Department of Health.

33. Barbosa has been employed with the Commonwealth of Puerto Rico Department of Health's Internal Audit Office since 1979. From 2001 to 2004, Barbosa was Standing Director of the Internal Audit Office of Puerto Rico's Department of Health ("Internal Auditing Office"). Barbosa was appointed by Rullán to this position which was a "trust" position.

34. In his capacity as Standing Director, Barbosa was in charge of directing the Internal Audit Office, and ensuring compliance with the Department of Health's Internal Audit Manual and programs.

35. From 2001 to 2002, Vélez was Deputy Director of Internal Audit Office. In that capacity, Vélez reported directly to Barbosa.

36. During the time period relevant to this action, every agency or institution which fell under the Department of Health umbrella, including the PRCCC, had its own Internal Audit Office. Those offices did not report to Barbosa.

37. Rullán created the task force to appoint experienced people who could provide him with a good evaluation of what was happening at the PRCCC.

38. To Rullán, the input provided by the task force would help the PRCCC become a functional hospital again.

39. In general, Barbosa's and Vélez's tasks as members of the special task force were to analyze part of an audit that had been conducted by an external auditing company, Zayas and Morazani, and to evaluate the work of the PRCCC's Internal Audit Office. In order to perform these tasks, Barbosa was to obtain a copy of the Zayas and Morazanni's audit report.

40. The legal component of the task force dealt with other separate issues such as allegations in connection with robberies and falsification of signatures.

41. During the years 2000 and 2001, Wilfredo Rivera was the PRCCC's internal auditor.

42. The members of the task force met with the plaintiff to advise her of the work that the task force would be performing.

43. After that meeting, Barbosa met with Rivera on at least three or four occasions.

44. In addition to meeting with Rivera, and as part of this special audit review, Barbosa met with other persons from the PRCCC including: Internal Auditor Rivera; Luis Cintrón, and Edwin Dávila. Barbosa also met with the PRCCC's Director of Finance.

45. At all times relevant to this action, Dávila was the person in charge of the PRCCC's Purchasing Office.

46. The audit portion of the task force's written report was completed before the legal component's written report had been finalized. After the separate reports were prepared, they were joined as a single report by one of Rullán's aids.

47. Once the compilation of documents was done, it was directly tendered to Rullán.

48. The audit portion of the report included the documents that were reviewed in the special auditing process.

49. Among other findings, in Barbosa's opinion, the purchasing and inventory offices of the PRCCC needed to be reorganized "because they were not carrying out good internal control."

50. During a group meeting between the members of the task force and Rullán, members of the task force verbally recommended that Rivera be terminated.

51. Barbosa recommended terminating Rivera, because she failed to appreciate the importance of the audit findings, and complained to the task force about PRCCC staff members.

52. Barbosa shared the opinion of Orlando Vélez that Rivera was not sufficiently assisting the PRCCC Internal Audit Office.

53. While employed as Executive Director, and in her capacity as Executive Director, Rivera sent various letters addressed to different public officials, institutions and individuals in which she addressed what she

considered to be irregularities or acts constituting governmental corruption or fraud at the PRCCC. These included: a letter dated June 25, 2001, to former Secretary of Justice Anabelle Rodríguez; a letter dated June 25, 2001 to the Puerto Rico Solicitor General; a letter dated October 15, 2001 to María del Rosario Ortiz, who at that time was Fraud Director of the Cooperativa de Seguros Múltiples; and a letter dated October 19, 2001, to Marlene Hunter from Federal Bureau of Investigation, and to Anabelle Rodríguez, Esq.

54. Rivera also made public expressions in connection with these matters, including some made when called upon to testify before a legislative committee.

55. All of these actions were taken without the approval of either Rullán or the board of directors.

56. On March 1, 2002, the PRCCC board of directors terminated Rivera's employment.

57. Before the board's decision, Rullán had received individual and group recommendations of members of the task force. This included their recommendation that Rivera be terminated. Rullán shared this recommendation with the other members of the board.

58. Rullán instructed Rivera to make sure that the competitors' proposals were objectively evaluated and that a documented methodology would be used in the selection process. Rullán wanted to be able to reproduce to the competitors, step by step, the whole evaluation process. Rivera did not have her written evaluation ready for their examination at the time when the board members requested it.

59. Rullán described the situation which prompted the request for proposals, "the UPR Anesthesiology Department was working both the teaching as the well (sic) as the services through a corporation that they had formed. And this corporation had to put money from their own anesthesiologists without so much support from the School of Medicine. And they were complaining that hey had to pay for the anesthetists and they wanted to get rid of the anesthetists. So we in the Board, including the Executive Director, were not going to tolerate it. So we said, 'Listen, you know, we're going to put in writing what services we want. If you guys compete that's fine, but we're going to look for outside help as well. So let's do and RFP and let's go and compete. See who wins it.' "

60. Moreover, in the board members' opinion, Rivera had not been able to work in consensus and harmony with the School of Medicine's faculty, nor with external cardiovascular surgeons. Rather, the general perception was that Rivera had taken sides with a group of surgeons.

61. Members of the board were particularly concerned about the fact that internal affairs of the hospital and faculty issues were brought up to the press constantly, and that this, in turn, was affecting the image of the medical care provided at the hospital. This matter was also affecting the hospital's admissions.

62. According to Rullán, all of the PRCCC's dirty laundry was being washed externally in the press

without first being discussed internally.

63. The decision to terminate the plaintiff was by consensus of the four members of the board, with consideration of the task force members' input.

64. After Rivera's termination, Carlos Meléndez, who had been appointed by Rivera, occupied the position of Executive Director in an interim capacity.

65. From March 2002 to August, 2003, Vicéns was appointed Executive Director of the PRCCC.

66. Vicéns is an attorney at law, and has a master's degree in health services administration.

67. Vicéns completed his law studies in 1979 at Georgetown University.

68. Vicéns pursued his Master's in health care services administration from 1997 to 2001.

69. Before his appointment as PRCCC Executive Director, Vicéns expressed what compensation he expected based on his experience, the responsibilities of the position, and the fact he had to commute.

70. Specifically, Vicéns proposed a minimum starting salary of $110,000.

71. When Vicéns negotiated his compensation package, he had no knowledge of the salary paid to the previous Executive Director.

72. Vicéns rejected a counterproposal presented by the PRCCC.

73. Vicéns discussed salary matters with the Secretary and with Julio César Galarcé.

74. Vicéns, contrary to the plaintiff, envisioned developing different management structures to improve the PRCCC.

75. Vicéns left the Executive Director position on August 31, 2003, because he was named Executive Director of ASES, the Puerto Rico Health Insurance Administration.

76. Vicéns received a salary increase when named Executive Director of ASES, the Puerto Rico Health Insurance Administration.

77. During his tenure as PRCCC Executive Director Vicéns was asked by the special investigations bureau "NIE" to aid in an investigation.

## III. ANALYSIS

### A. SECTION 1983 CLAIMS

■■■ The defendants argue they are entitled to summary judgment on Rivera's Section 1983 claims, because as Executive Director of the PRCCC, she held a policy-making position for which she could be fired in retaliation for exercising her First Amendment rights. To recover on a claim under Section 1983, Rivera must satisfy two elements. First, she must establish "an act or omission undertaken under color of state law." *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 55 (1st Cir.2006). This first requirement is easily satisfied here. Puerto Rico is considered a state for Section 1983 purposes, *Redondo–Borges v. United States Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir.2005), and it is uncontested that the defendants are officers of the Commonwealth of Puerto Rico. Second, Rivera must establish she was deprived of a federally secured right. *Aponte–Torres*, 445 F.3d at 55. Rivera claims the defendants violated her First Amendment right to freedom of speech when they fired her in retaliation for testifying before the Puerto Rico House of Representatives regarding administrative irregularities and nepotism at the PRCCC, and for writing letters to the Puerto Rico

Solicitor General, the Fraud Director of COSVI, the Secretary of Justice, and the FBI. The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v. Ceballos,* —— U.S. ——, 126 S.Ct. 1951, 1957, 164 L.Ed.2d 689 (2006). To establish a First Amendment violation, Rivera must demonstrate (1) her speech was a matter of public concern, (2) when balanced against each other, her First Amendment interests outweigh the government's interest in functioning efficiently, and (3) her speech was a substantial or motivating factor in the board of directors' decision to fire her. *See Jordan v. Carter,* 428 F.3d 67, 72 (1st Cir.2005).

■■■ The defendants are entitled to summary judgment on the plaintiff's Section 1983 claims, because, on the record before the Court, a reasonable jury would be compelled to find that the plaintiff's position as Executive Director was a policymaking position for which non-exercise of First Amendment rights was an appropriate qualification. The First Amendment does not protect public employees from political discrimination where the employees hold "political positions" for which party affiliation constitutes "an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Unlike non-policymaking positions "political positions" are terminable without cause when political affiliation is an appropriate requirement for the position. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 362–63, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This rule ensures that "representative government [will] not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod,*

427 U.S. at 367, 96 S.Ct. 2673. First Amendment protection does not extend to positions which potentially "involve decision making on issues where there is room for political disagreement on goals or their implementation" and where the jobholder is a policymaker, confidential assistant, spokesman, or similar officeholder. *Olmeda v. Ortiz–Quiñones,* 434 F.3d 62, 66 (1st Cir.2006) (quoting *Ortiz–Pinero v. Rivera–Arroyo,* 84 F.3d 7, 12 (1st Cir.1996)). Here, all parties agree that the Executive Director of the PRCCC holds a "trust" position under Puerto Rico law, but actual functions of the job, not titles, control, *id.* at 66. An official description of job functions is a presumptively reliable basis for determining those functions. *Id.* at 66. The First Circuit has "regularly upheld against First Amendment challenge the dismissal on political grounds of mid- or upper-level officials or employees who are significantly connected to policy-making ... It is enough that the official be *involved* in policy, even if only as an advisor, implementer, or spokesperson." *Id.* at 67 (emphasis in original).

The plaintiff's Duties and Responsibilities Sheet containing her official job description demonstrates that she held a policymaking position to which she had no First Amendment protection. In her opposition, Rivera argued that the board of directors held all policymaking authority at the PRCCC, but introduced no record evidence contradicting her official job description. Under its enabling act, ultimate control over the PRCCC is vested in its board of directors. P.R. LAWS ANN. tit. 24, § 343c (1989). However, the board can delegate policymaking authority to the Executive Director, *see* P.R. LAWS ANN. tit. 24, § 343d (1989). Rivera was the highest level officer at the PRCCC. In her official job description, Rivera was charged directly with, *inter alia,* "[e]xecut[ing] and formulat[ing] the public policy in relation to

the planning, organization, operation and administration of the cardiovascular services of the Corporation." The First Circuit observed that Supreme Court cases have tended toward protection for "a floor supervisor, a guard, a process server, an assistant public defender, a rehabilitation counselor, a road equipment operator, a garage worker, and a dietary manager." *Flynn v. City of Boston*, 140 F.3d 42, 45 (1st Cir.1998). When the degree of policy-making authority vested in these positions is compared to that vested in the plaintiff's, the instant case is not close.

## B. TITLE VII CLAIM

The defendants argue they are entitled to summary judgment on the plaintiff's Title VII claim against the PRCCC on the grounds that Title VII does not extend to policymaking employees, and that there is no genuine issue as to whether the defendants' actions were motivated by sex discrimination. Analysis of the defendants' first argument is unnecessary, because they prevail on the second.

 The plaintiff has presented no direct evidence of sex discrimination, and must therefore raise an inference of discrimination through the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, to raise an inference of sex discrimination sufficient to withstand summary judgment it is necessary for a plaintiff to demonstrate (1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer sought a replacement with roughly equivalent qualifications. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994). If the plaintiff establishes a *prima facie* case of sex discrimina-

tion, the burden shifts to the defendant-employer to state a non-discriminatory reason for the adverse employment action. *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir.2003). The burden then shifts to the plaintiff to demonstrate that the defendant's stated reasons are mere pretext for gender discrimination. *Id.* at 31.

 Here, even assuming the plaintiff could establish a *prima facie* case, there is no genuine issue as to whether the defendants' stated reasons for firing Rivera are mere pretext for sex discrimination. There is no evidence from which to conclude that the defendants' stated reasons for firing Rivera are not the real reasons, nor that gender discrimination is the real reason. The only evidence the plaintiff presented in support of her opposition to the defendants' motion to dismiss her Title VII claim is that she was replaced by a man who was paid more for the same job. This alone does not raise a genuine issue as to whether the plaintiff was terminated because of sex.

## C. EQUAL PAY ACT CLAIMS

 The EPA prohibits wage discrimination "between employees on the basis of sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). To establish a *prima facie* case of discrimination under the EPA, a plaintiff must establish that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions, and requiring equal skill, effort and responsibility. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Ingram v. Brink's, Inc.*, 414 F.3d 222, 232 (1st Cir.2005). In an EPA action, it is appropriate to com-

pare the plaintiff's compensation to that of her successors and predecessors. *Ingram,* 414 F.3d at 232 note 10. Once the plaintiff establishes a *prima facie* case of unlawful wage differential, the burden shifts to the employer to show that the differential is justified under one of the EPA's four exceptions: the payment was made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex. *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. 2223, *Ingram,* 414 F.3d at 232. The EPA's exceptions serve as affirmative defenses, on which the employer carries the burden of proof, not just production. *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. 2223; *Ingram,* 414 F.3d at 232.

■ The Court denies both sides summary judgment on the EPA claims. The defendants argue the EPA does not apply to the plaintiff's policymaking position. Under the provision the defendants invoke, the EPA does not cover state employees who are appointed by a holder of "public elective office" to serve "on a policymaking level." 29 U.S.C. § 203(e)(2)(C)(ii)(III). The record shows Rivera was hired by the PRCCC board of directors, not a public elective office holder. The defendants also argue that the plaintiffs could not muster a *prima facie* case under the EPA. Given the difference between Rivera's and Vicéns' salaries, and the stipulated similarity in their duties, Rivera could establish a *prima facie* case under the EPA. The plaintiff must be denied summary judgment on her EPA claim, because the defendants supported their opposition with the Vicéns' deposition testimony, which indicates he was paid the higher salary, because he demanded that salary.

■ The defendants did not move for summary judgment on the EPA claims on the ground that there is no genuine issue as to whether they would prevail on their affirmative defense that the pay differential was due to a factor other than sex. A district court may enter summary judgment *sua sponte* if discovery is sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts, and if the court first gives the targeted party notice and a chance to present evidence on the essential elements of the claim or defense. *Frederique–Alexandre v. Dept. of Natural and Environmental Resources, P.R.,* 478 F.3d 433, 438 (1st Cir.2007). Before trial the Court will determine whether a genuine issue exists as to whether the plaintiff was paid a lower salary due to a factor other than sex. The Court **ORDERS** the plaintiff to show cause why the defendants are not entitled to summary judgment on the ground that the plaintiff was paid a lower salary because of a factor other than sex. The plaintiff must comply with this order on or before July 30, 2007.

## D. CLAIMS UNDER PUERTO RICO LAW

■ The defendants only argument in support of its motion for summary judgment on Rivera's claims under Puerto Rico law is that the Court decline to exercise supplemental jurisdiction over them if it dismisses the federal claims. Because the Court denies the defendants' motion for summary judgment on the EPA claims, Rivera's claims under Puerto Rico law remain before the Court. If the Court dismisses the EPA claims after evaluating the plaintiff's anticipated motion in compliance with the above show cause order, the Court will decline to exercise supplemental jurisdiction over the claims alleged under Puerto Rico law, and will enter judgment dismissing them without prejudice.

## IV. CONCLUSION

The plaintiff's motion for summary judgment (**No. 133**) is **DENIED,** and the defendants' motion for summary judgment (**No. 136**) is **GRANTED IN PART AND DENIED IN PART.** Rivera's Section 1983, and Title VII claims will be dismissed with prejudice. Rivera's claims under the Equal Pay Act, and under Puerto Rico law remain before the Court. The Court **ORDERS** the plaintiff to show cause why the defendants are not entitled to summary judgment on the ground that the plaintiff was paid a lower salary because of a factor other than sex.

**IT IS SO ORDERED.**